**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**RONNEY STUCKEY,**

      **Petitioner,**

**v.**                               **Case No. 4:14cv45-RH/CAS**

**JULIE L. JONES, Secretary,
Department of Corrections,[1]**

      **Respondent.**
                               /

## REPORT AND RECOMMENDATION TO DENY § 2254 PETITION

On January 30, 2014, Petitioner Ronney Stuckey, represented by

counsel, filed a petition for writ of habeas corpus pursuant to 28 U.S.C.

§ 2254.   ECF No. 1.   Petitioner also filed a supporting memorandum.

ECF No. 4.   After direction by this Court, ECF No. 5, Petitioner filed an

amended § 2254 petition, ECF No. 6.   On December 11, 2014,

Respondent filed an answer, with exhibits.   ECF No. 18.   Petitioner has

not filed a reply, although given the opportunity to do so.   *See* ECF No. 17;

*see also* ECF Nos. 8, 10, 12, 13, 15.

---

[1]The Clerk of Court shall substitute Julie L. Jones, as Secretary of the Florida
Department of Corrections, for Michael D. Crews.   Julie Jones became Secretary on
January 5, 2015, and shall be automatically substituted pursuant to Federal Rule of Civil
Procedure 25(d).

The matter was referred to the undersigned United States Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and Northern District of Florida Local Rule 72.2(B).   After careful consideration of all issues raised, the undersigned has determined that no evidentiary hearing is required for disposition of this case.   *See* Rule 8(a), R. Gov. § 2254 Cases in U.S. Dist. Cts.   For the reasons stated herein, the pleadings and attachments before the Court show that Petitioner is not entitled to federal habeas relief, and this § 2254 petition should be denied.

## Background and Procedural History

By amended information filed April 17, 2006, in case number 2005-CF-2325, in the Second Judicial Circuit, Leon County, the State of Florida charged Petitioner, Ronney Stuckey, with two counts:   (1) sexual battery on a child under 12 years of age by a defendant 18 years of age or older, a capital felony, in violation of section 794.011(2)(a), Florida Statutes, in connection with events that occurred from 1995 to 1997; and (2) sexual battery by a familial or custodial authority, a first degree felony, in violation of section 794.011(8)(b), Florida Statutes, in connection with events that

occurred from 1998 to 2002.   Ex. C at 2.[1]   *See id.* at 1 (original

information, filed July 21, 2005).   Stuckey proceeded to a jury trial on April

19, 2006, before Judge Jonathan Sjostrom.   Ex. E (trial transcript).

Stuckey testified during the trial.   *Id.* at 153-201.   The jury found him guilty

as charged.   *Id.* at 248-50; Ex. C at 48.   At the conclusion of the trial, the

court adjudicated him guilty and sentenced him to life in prison on Count 1

and 30 years in prison on Count 2, to run concurrently, with no parole

eligibility.   Ex. C at 51-61.   On August 13, 2007, the court rendered an

amended judgment and sentence, imposing a life sentence with the

possibility of parole on Count 1 and a concurrent sentence of 30 years in

prison on Count 2.   Ex. C at 102-12.   On March 12, 2008, the court again

rendered an amended judgment and sentence, imposing a sentence of 30

years in prison on Count 2, with credit for 37 days time served.   Ex. C at

114-21.

Stuckey appealed his conviction and sentence to the First District

Court of Appeal (DCA), assigned case number 1D06-2611.   Ex. I (Initial

---

[1]Hereinafter, all citations to the state court record, "Ex. –," refer to exhibits submitted
with Respondent's answer, ECF No. 18.

Brief); Ex. J (Answer Brief); Ex. K (Reply Brief).   On July 23, 2009, the

First DCA affirmed the case per curiam without a written opinion.   Ex. L;

Stuckey v. State, 13 So. 3d 60 (Fla. 1st DCA 2009).   The mandate issued

August 10, 2009.   Ex. M.

On October 18, 2010, through counsel, Stuckey filed a motion for

post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850

in the state trial court and raised eight claims.   Ex. O at 1-19.   By order on

April 4, 2011, the state post-conviction court, Judge Josefina Tamayo,

struck two of the claims as legally insufficient, with leave to amend.   Ex. O

at 20-21.   On May 4, 2011, Stuckey's counsel filed an amended motion.

Ex. O at 22-24.   The state post-conviction court, Judge Mark E. Walker,

held an evidentiary hearing on June 1, 2012, with argument on June 29,

2012.   Ex. O at 42-259.   On July 2, 2012, Judge Walker rendered an

order denying the Rule 3.850 motion for the reasons stated on the record.

Ex. O at 34-35.

Stuckey, through counsel, appealed to the First DCA and filed an

initial brief in case number 1D12-3682.   Ex. P.   The State filed an answer

brief.   Ex. Q.   On November 12, 2013, the First DCA per curiam affirmed

the appeal without a written opinion.   Ex. R; <u>Stuckey v. State</u>, 129 So. 3d

1072 (Fla. 1st DCA 2013) (table).   Stuckey filed a motion for rehearing, Ex.

S, which the First DCA denied by order on January 10, 2014, Ex. T.   The

mandate issued January 28, 2014.   Ex. U.

As indicated above, Stuckey filed a petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254 in this Court on January 30, 2014.   ECF

No. 1.   He subsequently filed an amended § 2254 petition.   ECF No. 6.

He raises five grounds, including claims alleging ineffective assistance of

counsel (IAC):

> (1)  IAC – Trial counsel failed to prepare the case for trial, failed to prepare Stuckey to testify, and failed to inform Stuckey regarding the actual time he would serve if he accepted the State's plea offer.   *Id.* at 6-12.

> (2)  IAC – Trial counsel "failed to effectively cross-examine one of the State's key witnesses whose testimony was apparently fabricated." *Id.* at 13; *see id.* at 13-16.

> (3)  Trial Court Error and IAC – "The prosecutor committed fundamental error during his closing argument (shifting the burden of proof by telling the jury that Petitioner Stuckey had to present a defense, telling the jury that their oaths required a guilty verdict, and telling the jury to return a verdict that 'speaks the truth[')]; Counsel rendered ineffective assistance of counsel by failure to object to the improper comments."   *Id.* at 16; *see id.* at 16-19.

> (4)  IAC – Trial counsel failed "to object to the jury instructions, in that

the information stated the act was penetration by his penis and fingers, and the jury instruction stated penetration occurred by the penis and/or fingers thus allowing a non-unanimous verdict."   *Id.* at 19; *see id.* at 19-20.

(5)  Trial Court Error – "The trial court erred by relying upon Petitioner's conviction for a capital felony as a basis for an upward departure sentence."   *Id.* at 21; *see id.* at 21-24.

Respondent has filed an answer, with exhibits.   ECF No. 18.   Petitioner has not filed a reply although given the opportunity to do so.   *See* ECF No. 17; *see also* ECF Nos. 8, 10, 12, 13, 15.

## <u>Analysis</u>

Pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), federal courts may grant habeas corpus relief for persons in state custody.   Section 2254(d) provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in
the State court proceeding.

28 U.S.C. § 2254(d).   *See, e.g.,* <u>Cullen v. Pinholster</u>, 563 U.S. 170, 180-83

(2011); <u>Gill v. Mecusker</u>, 633 F.3d 1272, 1287-88 (11th Cir. 2011).   "This is

a 'difficult to meet' and 'highly deferential standard for evaluating state-

court rulings, which demands that state-court decisions be given the benefit

of the doubt.'"   <u>Cullen</u>, 563 U.S. at 181 (quoting <u>Harrington v. Richter</u>, 562

U.S. 86, 102 (2011), and <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24 (2002)).

This Court's review "is limited to the record that was before the state court

that adjudicated the claim on the merits."   *Id.*

For claims of ineffective assistance of counsel (IAC), the United

States Supreme Court has adopted a two-part test:

> First, the defendant must show that counsel's performance was
> deficient.   This requires showing that counsel made errors so
> serious that counsel was not functioning as the "counsel"
> guaranteed the defendant by the Sixth Amendment.   Second,
> the defendant must show that the deficient performance
> prejudiced the defense.   This requires showing that counsel's
> errors were so serious as to deprive the defendant of a fair trial,
> a trial whose result is reliable.

<u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).   To demonstrate

ineffectiveness, a "defendant must show that counsel's performance fell

below an objective standard of reasonableness."   *Id.* at 688.   To

demonstrate prejudice, a defendant "must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different."   *Id.* at 694.   "A reasonable

probability is a probability sufficient to undermine confidence in the

outcome."   *Id.*   For this Court's purposes, importantly, "[t]he question 'is

not whether a federal court believes the state court's determination' under

the Strickland standard 'was incorrect but whether that determination was

unreasonable – a substantially higher threshold.'"   Knowles v. Mirzayance,

556 U.S. 111, 123 (2009) (quoting Schriro v. Landrigan, 550 U.S. 465, 473

(2007)).   "And, because the Strickland standard is a general standard, a

state court has even more latitude to reasonably determine that a

defendant has not satisfied that standard."   *Id.*   It is a "doubly deferential

judicial review that applies to a Strickland claim evaluated under the

§ 2254(d)(1) standard."   *Id.*

## Ground 1:   IAC – Preparation for Trial, Testifying, and Plea Offer

In his first ground, Petitioner Stuckey argues his trial counsel

provided ineffective assistance because he (a) failed to prepare the case

for trial and to prepare him to testify, and (b) failed to inform him of the

actual time he would serve if he accepted a plea offer.   ECF No. 6 at 6-12.

Stuckey raised these arguments in state court in his amended Rule 3.850

motion.   Ex. O at 22-24.

## (a)  Preparation for Trial and Testifying

In this portion of Ground 1, Stuckey focuses chiefly on defense

counsel's efforts, or alleged lack thereof, in preparing him to testify for trial

and defense counsel's decision to re-play recorded conversations between

Stuckey and the victim during Stuckey's testimony.   *See* ECF No. 6 at 8,

12.   After the evidentiary hearing, the state post-conviction court denied

these claims, finding:

> The issue of prepping the witness, we have the defendant
> who says, I you know, have very little contact, he told me very
> little, we didn't go over the tape.   And then we have Mr.
> Desmond, who is pulling out memos and so forth to
> memorialize conversations, discussions and activities, as well
> as notes and so forth.
>
> I'm not going to resolve each and every factual dispute,
> because there's a number of factual disputes.   And let me
> make plain that I'm not – it's not an all or nothing analysis.   It is
> entirely possible that Mr. Stuckey could be wrong, that the
> handwritten notes from the depositions were from the trial as
> opposed to Mr. Ufferman, but he didn't intentionally lie to the
> Court about it.
>
> It's also entirely possible that Mr. Desmond thought they
> were, because he went back four years later, five years later
> and looked at the file and thought they were given to him,

when, in fact, it was something that ended up being put in his file by Mr. Ufferman when he returned the file.

So there's a number of disagreements between Mr. Stuckey and Mr. Desmond's – or inconsistencies between their testimony, but it doesn't necessarily mean one of them is absolutely right or wrong.   I've got to view them all, and view all the contradictions, all the things we've eluded to, and figure out bottom line who does this Court believe with respect to was Mr. Stuckey prepped.

And I've already – and there are some things that support the fact that there was consultation.   I mean, we know they had some discussions because we have the letter that Mr. Stuckey signed that was given to him at jury selection saying that he was turning down a plea offer of 15 years and so forth.

We have the memo of Ms. Jordan that was prepared contemporaneous.   We even got the fax log at the top showing that it came from Dobson, Kitchen and Smith where Ms. Jordan's office was, faxing it to the Ronney Stuckey file after trial saying, yeah, let me contemporaneously with the events memorialize what happened.   None of those pieces are dispositive, but they corroborate the testimony.   Moreover, I've got to weigh people's – judge and weigh credibility.   And I want to again point out for the record.   I do not believe for – I understand that once you're convicted you may be more focused on the transcript and stuff.   That's clear and that's appropriate and that's understandable.

But I simply do not accept or believe for a minute that Mr. Stuckey, given his presentation in court, his comments on the record, et cetera, that he was so disengaged that he had virtually had very limited contact with Mr. Desmond, as he tried to lead this Court to believe during his direct.

Instead, I find that based on not only the exchanges the documentation in the file, his comments at trial, his statements

on the record, his answers, coupled with Mr. Desmond's testimony, that Mr. Desmond, in fact, did have a great deal of contact, that he did, in fact, as Mr. Desmond say[s], come by his office, go over the depos, go over the tapes.

You know, you read the transcript and Ms. Frusciante is spot on when she says it's like watching a train wreck when you're reading the testimony.   And is that symptomatic of Mr. Desmond not having prepped Mr. Stuckey, or is it because Mr. Stuckey was in-artfully in court, having sat through and heard the opening statement of the prosecutor, and having seen the witnesses, having watched the jury's reaction, is not performing well at trial?

I believe Mr. Desmond's testimony – well, first of all, Mr. Stuckey had said he went over the tape in January, which was several months admittedly before trial.   Mr. Desmond testified that he had been to his office a number of times and that they had listened to the tape before and had listened to the tape together.   I believe Mr. Desmond's testimony.   Simply because a defendant meets with you and you prep them and they crash and burn at trial does not make you an ineffective lawyer, or mean that you didn't prep your client.   That's going to be a function of the client doesn't do well.

And I've got to state for the record, again, you know, trying cases as a lawyer helps me sit as a judge when I'm trying to look at how these things play out.   I've got to state without equivocation, I would not want to be held accountable for what some of my clients said on the stand after I spent days prepping them, because I've seen and stared at witnesses in amazement as to what came out of their mouths after I spent hours prepping them, or going over and even had the questions written out.

So that doesn't mean that that happens in every case.   It simply means that I found Mr. Desmond's testimony to be credible.   I believed that he went over it and he did his best to

prep Mr. Stuckey.   And simply because Mr. Stuckey crashed
and burned in his testimony doesn't mean that Mr. Stuckey
wasn't prepped, for the reasons I just stated.   It's entirely
possible he was.   And I believe he was, based on Mr.
Desmond's testimony.

Ex. O at 241-45.   On appeal, the First DCA affirmed without an opinion.

These rulings are entitled to AEDPA deference and review is limited to the

record before the state court.   *See* 28 U.S.C. § 2254(d); <u>Cullen</u>, 563 U.S.

at 187-88; <u>Richter</u>, 562 U.S. at 99-03; <u>Wright</u>, 278 F.3d at 1255.

The record supports the post-conviction court's findings.   In

particular, at the evidentiary hearing, Stuckey's trial counsel, Sean

Desmond, referred to notes in his case file and testified he went over

depositions in the case with Stuckey, he had subpoenaed phone records of

the victim and the victim's mother, and he discussed strategy with Stuckey.

Ex. O at 101-09.   Mr. Desmond testified that after he listened to the tapes

of the phone conversations between Stuckey and the victim, he thought "it

was damaging, very damaging."   *Id*. at 110.   He testified, "[W]e started to

listen to those and discuss how we were going to approach the case."   *Id*.

Mr. Desmond hired an investigator, Monica Jordan:

[Ms. Jordan] came on board.   My main purpose was to
put her in the same room with Mr. Stuckey and essentially say,
here is our investigator.   Anyone you want to track down, any
theory that we can come up with, any stone, tell her and we'll

uncover it.   And she actually generated a report and gave it to me.

*Id.* at 111.   Ms. Jordan's report was included in Mr. Desmond's file.   Id.

Mr. Desmond testified that he met with Stuckey and discussed the

evidence against him "[a]t length."   *Id.* at 122.   He documented this by

having Stuckey sign a letter, dated April 7, 2006, in which Desmond went

over the potential sanctions and the trial strategy.   *Id.* at 123.

Mr. Desmond further testified that, prior to the trial, he discussed with

Stuckey whether or not he would testify and Stuckey indicated he wanted

to testify "[w]ithout a doubt."   *Id.* at 125.   Desmond further testified:

> Q   Did you go over what his testimony would be?   Did you prep him basically in preparation for his testifying?
>
> A   Yes, we had lengthy discussions on that.   And we had – the theory of the defense was, as I mentioned before, that the victim had gotten hooked on drugs and was engaged in this relationship with Mr. Stuckey, and then started to have sex with him when she was 18.   So we were absolutely denying that anything had previously happened.   And so faced with that, we had to contend with some of the very, very incriminating statements on this tape.
>
> Q   Now let's talk about this tape.   This was a controlled call that was made between the victim and the defendant; is that correct?
>
> A   Correct.
>
> . . . .

Q   Okay.   Now during the course of the trial, you played that during your direct of him, and then you would stop and allow him to explain the statements that were on the tape; is that correct?

A   Correct.

Q   Was that a trial strategy?   Is that something you guys discussed beforehand?

A   Yes.   And I went over it with him in my office, we did it line-by-line.   You know, that was the whole thing, we played the tape and – because it was damning.   It was tough stuff.   And I would say, Mr. Stuckey, how do you respond to that?   And he would tell me.   And then we would stop it and then we would go on and okay.   And so he wanted to explain the statement. He was very intent on doing that.

        And one of the features of the theme of our defense was throughout the time for the jury not to take the statement in a vacuum.   I said that many times.   Essentially, if you're going to listen to this and make your rush to judgment, let's hear what was really going on.   And, in fact, we tried to assert that the reason he wasn't so blatantly, you know, right back at her yelling at her, why are you making this up, was because he didn't want to anger her, because he didn't want her mom to find out he was having this affair with her.   Because even though they were finished, it would be a huge blow up.   So that was a fully developed, and we went through his testimony at length on that point.

Q   Okay.   Now there has been an allegation that the defendant had no idea you were going to do this and that you just threw him up there and you played this tape, you know, and you guys hadn't discussed it beforehand.   Is that true?

A   No.   I mean, I will give it to Mr. Stuckey, he was very, very

actively involved in everything.   He was – we had a large debate at one point because he brought all this information about his erectile dysfunction.

Q   Let's talk about that for a second.   Now was there a discussion about employing that as a potential defense in the case?

A   Yes.   He brought me this flier that he had given me about – it's called penile self-injection.   We talked about his issues with that.   And I explained to him in the letter, too that after vetting it a little bit the allegations were going to be that she had been digitally penetrated, not just by the penile but by the fingers as well, and that that qualified to meet the statute and would risk him getting convicted.

And I went over my feeling.   And we talked about it, and I think I said here, this decision not to go forward with the penile dysfunction stuff has been made for two reasons.   First, the allegations include claims that you performed digital penetration in addition to penile penetration to the victim.   This means that if the jury believes that you put your fingers into the vagina of the victim at the age of nine, you could be convicted of the offense irrespective of your medical condition.

And then secondly, this was really the key, one of the big things in addition, our defense strategy in this case is to shift the focus from you and place the focus on the victim's credibility.   It is my belief that presenting testimony with regard to your medical condition could become the focus of the trial and would take away from the focus of the victim.

In other words, I did not believe that it was not wise to add more sex into this case.   It is my experience that the better strategy in this type of situation is to focus on whether the victim is being deceptive to cover up her illicit affair with you and her drug problem, not whether you are able to perform.

Q   And let me stop you there, Mr. Desmond.   Correct me if I'm wrong, but didn't it also come out that after the victim turned 18, that he did, in fact, have a consensual sexual relationship with her?

A   Exactly.   In other words, there were two inconsistent paths. If we were going to start – it would be hard to argue to a jury that never did it happen, but it couldn't have happened because I had a penile thing going on, but I was having an affair after with her.   It was going to be very inconsistent.   But I noted back then that it was something that we needed to have consensus on, because that was what I thought, as his lawyer, was the best shot he had at prevailing.   So that's why I had him sign this and go over it with me.

*Id.* at 125-29.

### (b) Plea Offer

After the evidentiary hearing, the state post-conviction court found trial counsel performed deficiently in incorrectly advising Stuckey regarding the time he would serve in prison if he accepted the State's plea offer, although the court explained that finding was a close call given the difference between the plea sentence and the life sentence without parole that Stuckey faced if found guilty at trial:

He had a 12-year offer on the table, with or without knowledge – let's assume that he was told appropriately [regarding gain time] – he would have been either told inappropriately that that meant 85 percent, which would have been the 10.2 years; or he would have been properly instructed, based on the time of the law that it was 7.2.   We don't know exactly what he was told.

In fact, I find that there was – based on both Mr. Stuckey's testimony and Mr. Desmond's testimony, that at best there was an improper statement that it was 85, but there was no precise calculation.   Mr. Stuckey is a bright man, so I think a reasonable inference from the testimony is that he was being told you're going to spend north of ten years on 12 years, when in fact it appears, based on the record from this Court, it would have been somewhere slightly north of seven years.

So giving Mr. Stuckey the benefit of the doubt that it was the worst possible information communicated to him, that you're going to serve 10.2 of the 12, when he should have been told you're going to serve 7.2 of the 12, again giving the benefit of the doubt to Mr. Stuckey that that, in fact, would have been the actual sentence of 7.2.   And we need not go through all the analysis that obviously if you told somebody what gain time, you would have to tell them you can lose gain time, there's no guarantee that you will get the gain time.   There's all kinds of other permutations to this.

But essentially, at the end of the day, I've got to decide one, was there deficient performance by not giving him more accurate information regarding the gain time, and that 12 years meant more like seven than ten.   And, if so, was there prejudice.   I find that there was deficient performance.   I'm not going to play games.   I don't think you're required to tell a defendant that they're really – the exact day-to-day they're looking for.   I don't think the lawyers are required to do that and I don't think the judge is required to do that.

But for a defendant to think I'm spending 12 years versus seven, that is a huge difference to not tell the person that.   And a lawyer should give their client some idea and should know that the law is changed, such that don't listen to what everybody is telling you in the jail, it's actually far less time. Again, I'm not saying that you have to tell them, calculate it. I'm not saying you have to do the math.   In fact, I think if I'm a

lawyer or a judge, I'm going to be reticent to tell somebody
precisely how many days they're going to spend.   And having
said that, that's a close call.

It's particularly a close call here when you're facing life
without a possibility of parole.   Suddenly whether it's ten or
twelve, or seven or twelve, quite frankly becomes less
important.   So while I find that Mr. Desmond should have been
more precise in what he communicated regarding what the
actual sentence would have meant, that's a close call on
deficient performance.

Ex. O at 250-52.   The judge found it was not clear "what, if anything, he

told Mr. Stuckey," *id.* at 252, and the judge was "assuming he told him

nothing," *id.*, and "[b]ased on the record . . . , it doesn't appear there was

any discussion of gain time at all," *id.* at 253.   The judge then found

Stuckey had not shown prejudice resulting from the deficient performance

because Stuckey had made clear that he was not going to take a plea and

he insisted on going to trial:

Having said that, assuming arguendo – and again, I don't
think there's any reasonable possibility the outcome would have
been different.   I absolutely find that it strains – you know, it is
– where somebody is facing life without possibility of parole, the
notion that being told it would have been seven rather than ten
years, the 85 percent – I would have gone ahead and done
seven years facing life, but I wasn't willing to do ten or twelve,
it's simply I find that there's no reasonable possibility from
Monica Jordan, the letter he signed, as well as his statements
on the record.

Mr. Stuckey insisted on going to trial.   He was not going

to take a plea.   And I find there's no reasonable possibility that
it would have affected the outcome.   And having found the first
prong, I've got to say that that finding that it was deficient I'm
troubled by, because it's marginal at best.   Because as the law
teaches us, I'm not supposed to go back and fly speck and do
the optimal, you've got to say what's under the circumstances.
Under the circumstances, Mr. Stuckey didn't want to discuss a
plea that was going to result in a lengthy prison sentence.   He
was willing to roll the dice and go to trial and face a life
sentence.   Again, based on the record before me, the exhibits
which corroborate Mr. Desmond's testimony, I find there is no
reasonable possibility that Mr. Stuckey would have accepted
that plea offer had he had a more detailed discussion about
gain time.

*Id*. at 253-54.   On appeal, the First DCA affirmed without a written opinion.

The state court's ruling is entitled to deference and review is limited to the

record before the state court.   *See* 28 U.S.C. § 2254(d); <u>Cullen</u>, 563 U.S.

at 187-88; <u>Richter</u>, 562 U.S. at 99-03; <u>Wright</u>, 278 F.3d at 1255.

The record supports the post-conviction court's findings.   In

particular, just before the trial started, the following transpired on the record

regarding Stuckey's rejection of the plea offer:

MR. DESMOND:   Yes, Your Honor, one thing.

Just to put on the record, yesterday or actually I think it
was Monday Mr. Flury [the prosecutor] did make a revised
offer.   The original offer was 15 years prison followed by
lifetime probation.   The offer was renewed and lowered to
twelve years prison followed by probation.

I have conferred with my client at length about that and he

has decided not to take that.   I just wanted it clear on the record.

THE COURT:   All right.   Mr. Stuckey, did you hear that, what Mr. Desmond just said?

THE DEFENDANT:   Yes.

THE COURT:   And you understand that and you understand that the Court is not bound by whatever offers if you are ultimately convicted?   But, have you had enough time to discuss those offers with Mr. Desmond?

THE DEFENDANT:   Yes.

THE COURT:   All right.   Very well.

MR. FLURY:   Judge, you are bound by life in prison if he is found guilty as charged.   It's mandatory.

THE COURT:   Right.   My point is –

MR. FLURY:   You were saying about the offer?

THE COURT:   Right.   That's exactly right.   My discretion is what the law is.   But, the point I wanted to make was I'm not bound by the lower limit of what you've offered.

MR. FLURY:   That's true.

Ex. E at 5-6.

In addition, at the evidentiary hearing, defense counsel testified regarding the plea offer discussions with Stuckey:

Q   And what did you tell Mr. Stuckey about his gain time?

A   I told him we were facing life in prison and that he would be
– if he was convicted, he would go straight in, which is what
happened.   That if he took the plea offer from the State, he
would be serving – it would be a 12-year deal, and that he
would likely only serve 85 percent of that, and he would get out.
The whole idea was he would get out before he was 60.

        And I remember having that discussion with him at length
saying if you take this, you'll be out before you're 60 years old
and you'll be able to see blue skies and do all those sorts of
things again.   Are you sure you don't want to take that?
That's why I put it back on the record when we had the trial.

        So to answer your question yes, I would have – I don't
remember, you know, specifically going through and
calculating, you know, the specific dates or something like that,
but the whole gist was, yeah.

Q   But you did tell him something about 85 percent, you
believe?

A   You know, I don't remember specifically saying, you know,
talking about the gain time or not, honestly.   I just remember
telling Mr. Stuckey life, or a term of years that is going to get
you out.   And that's really the gist of that discussion.

Q   Okay.   So you didn't – you don't recall whether you
discussed gain time with him or not?

A   You know, I don't have an independent recollection of it.

. . . .

Q   Okay.   So the bottom line of that is that you did not realize
that he might serve significantly less time because of the gain
time calculation would be different based upon the time that his
– that the allegations charged him with?

A   What I told him and what we dealt with on the record was if convicted you're looking at life in prison.

Q   Okay.

A   And if you don't – you know, at that point there was a discussion by, I think the prosecutor weighed in, Judge Sjostrom weighed in, and my main purpose was to make it abundantly clear that I had alerted Mr. Stuckey of the possibility or the reality that there was a 12-year term of years offer on the table.

Ex. O at 134-38.   Mr. Desmond also testified that "at no time" did Mr. Stuckey express any interest in entering a plea to any term of years.   *Id.* at 139.   Although Stuckey testified he would have taken a plea offer if the gain time calculation had been explained, *id.* at 86, the state post-conviction trial court judge specifically accepted the testimony of defense counsel, which was corroborated by exhibits admitted at the hearing, and found Stuckey would not have accepted the plea offer and wanted to proceed to trial.   *See* Lafler v. Cooper, 132 S.Ct. 1376, 1385 (2012) (clarifying that Sixth Amendment right to effective assistance of counsel extends to negotiation and consideration of plea offers that lapse or are rejected, and concluding that, to establish prejudice, defendant must show reasonable probability that but for counsel's ineffectiveness: (1) "the plea offer would have been presented to the court (i.e., that the defendant would

have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances)"; (2) "the court would have accepted its terms"; and (3) "the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that were in fact imposed").

The state post-conviction trial court sits as the fact-finder and determines witness credibility in Rule 3.850 proceedings. *See, e.g.*, Smith v. State, 697 So. 2d 991, 992 (Fla. 4th DCA 1997); Fla. R. Crim. P. 3.850(d). "Federal habeas courts have 'no license to redetermine credibility of witnesses whose demeanor was observed by the state court, but not by them.'" Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011) (quoting Marshall v. Lonberger, 459 U.S. 422, 434 (1983)).

Based on the foregoing, Stuckey has not shown the state court's rejection of this ground was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d)(1)-(2). This ground should be denied.

## <u>Ground 2</u>:   IAC – Cross-Examination

In his second ground, Petitioner Stuckey asserts defense counsel

failed to effectively cross-examine one of the State's witnesses, M.J., the

victim's mother, whose testimony he alleges was apparently fabricated.

ECF No. 6 at 13-16.   Stuckey raised this as the first ground in his Rule

3.850 motion.   Ex. O at 3-4.   Specifically, Stuckey alleged in his motion:

> During trial M.J., J.M.J.'s mother, testified that in 2001
> she caught Defendant Stuckey standing over J.M.J. with her
> boxer shorts pulled down.   M.J. stated that she and Defendant
> Stuckey fought over the matter at that time, then she made
> Defendant Stuckey move out of the house and terminated all
> contact with Defendant Stuckey.   However, testimony from
> several witnesses [Ms. Walker, Lakeisa Spenser, Mr. Hill,
> Timothy Walker, Monica Bryant, and other neighbors] would
> have shown that Defendant Stuckey lived with M.J. until 2002.
> Witness testimony would also have shown that M.J. did not kick
> Defendant Stuckey out of the house rather, he moved out when
> he learned that M.J. was having an affair [with Anthony Hill].   In
> addition, witness testimony and utility records would have
> shown that M.J. and Defendant Stuckey continued to have a
> civil relationship after he moved out, suggesting the incident
> that M.J. testified to never occurred.   She helped him out by
> signing for his utilities on several occasions and invited him to
> her eldest daughter's graduation party in 2003.

*Id.* at 3 (footnotes omitted).

After the evidentiary hearing, the state post-conviction court denied

the claim, making the following findings:

> Starting with the cross-examination of the victim's mother,

[M.J.,] as I eluded to earlier, her testimony about when they broke off, how many times they broke off, was it 2001, was it 2000, was it – multiple times she answered perhaps.   And I think we previously referred to her testimony on the – with prior discussions, for example, on Page 46, and then going on to when she was cross-examined, how many times did you kick him out?   Starting on page 52, I don't remember.   I can tell you that I don't remember.   More than once.   Probably more than twice.   On page 53, I don't remember.   And then we went and started on Page 53, going on, how many times did you call him, how many times did you contact him and so forth.   So clearly there was cross-examination both through questioning as well as the phone records to establish that there had been ongoing relations between the victim's mother, as well as Mr. Stuckey.

There was a vigorous cross-examination, there were documents used.   The question becomes, was it ineffective assistance of counsel; that is, was there deficient performance as to prong one.   The fact that additional documentation, such as the warranty deed and various records regarding insurance and so forth were not brought in to show an ongoing relationship between the mother of the victim and Mr. Stuckey.

First, based on the record that was before the jury, there was no doubt that there was ongoing – while she tried to equivocate, the fact that she equivocated made her less credible, not more credible.   The fact that you then could pin her down with additional documentation.   The question is, was it deficient not to have it and was it prejudicial.   Without belaboring the point, and you have to look at the record as a whole and refer to it multiple times, I find that it was not deficient performance to secure the additional records.   I find that Mr. Desmond did cross-examine on these points, did have documentations, did establish there was ongoing contact.   And regardless, had he put an exclamation point on his impeachment – first of all, much of her testimony was I don't recall.   So the question would be, how you would have done

impeachment because it wouldn't necessarily have been precise impeachment.   You would have had to at first refreshed her recollection, as opposed to truly impeached her, since her answers were over and over, I don't recall, or equivocating.   And it was in a general range, which is consistent with it could have been 2002, just as easily as 2001. She said it happened during, you know, a number of years ago.

In any event, I find that it wasn't a deficient performance not to have these additional documents that were – some of which were filed as Defense Exhibit 1, Composite Exhibit 1, 2, 3, and 4.   Moreover, with respect to some of those documents, as I indicated I believe when we last met, there are certain things, such as insurance and so forth, that can be ongoing, and some things that would remain in somebody else's name, even if they weren't living there and so forth.

And as I indicated just a few moments ago, the question is, to refresh your recollection since your testimony is that she has equivocated anyway.   So the damage was done to make the witness appear to equivocate and be less credible.   And regardless, I find that it wasn't deficient.

Given the evidence in this case, which we've talked about the admissions, we had a – the defendant, who we used the initials – I mean, I'm sorry, the punitive victim whose initials we used, who testified.   We've got the multiple statements made on the audio tape which are very damning.   That combined, I find there's no prejudice; that is, [there] is no reasonable possibility that had there been additional cross-examination of the mother that it would have reasonably affected the outcome.

Ex. O at 232-35.   On appeal, the First DCA affirmed without a written opinion.   The state court's ruling is entitled to deference and review is limited to the record before the state court.   *See* 28 U.S.C. § 2254(d);

<u>Cullen</u>, 563 U.S. at 187-88; <u>Richter</u>, 562 U.S. at 99-03; <u>Wright</u>, 278 F.3d at 1255.

The record supports the post-conviction court's findings.   During her trial testimony on direct, M.J. testified that an incident occurred in 2001 or 2002 involving Stuckey and J.M.J. that prompted her to tell Stuckey to move out of the house:

Q   Did there come a time when you told Mr. Stuckey you've got to get out?

A   Yes, sir.

Q   Can you tell us how that came about?

A   Yes, sir.

Q   First, let me ask you, when was it?

A   About 2001.

Q   Let me back up and ask you, what is [J.M.J.]'s date of birth?

A   February 2, 1986.

Q   When you lived there, [J.M.J.] was about 15 or 16?

A   Yes, sir.

Q   Why did you tell him to get out?

A   Earlier that day, I had went to the dentist and I had surgery on an upper tooth.   And my dentist had told me that it probably would affect my sinuses and she told me to use like a nasal

spray or whatever.   So, I went to bed.   I woke up I guess about 2:00 in the morning and I couldn't find my nasal spray. And I knew my oldest daughter has sinus problems.   Mr. Stuckey wasn't in the room, but I figured he was just in the house somewhere, since he lived there.
As I was walking towards my daughter's room . . . .   And as I walked by the room, Mr. Stuckey was in [J.M.J.]'s room.

Q   Just tell us what you saw.

A   He was standing by her bed and he had on a t-shirt and some real tight shorts.   And she was laying on her stomach, asleep.   He had her boxers and her shorts pulled down to her knees.   And I asked him what was he doing.   He said nothing. And I told him, I said, yes, you're doing something.   And we got into it and I put him out.

Q   Okay.   Did he tell you what he was doing?

A   Oh, yes.   He told me he wasn't going to have sex with her, he was just going to jack off.

Q   What was your response to that?

A   I was real upset.   Actually, I tried to fight him.   I was really upset.

Q   How old was [J.M.J.] at the time?

A   She was about maybe 15, 16.

Q   Did you go to law enforcement about it?

A   No, sir.

Q   Why not?

A   Because I didn't want her to know.   I didn't want her to

know that he would even try to do something like that to her.

Q   Did you think she was sleeping?

A   Yes, sir.

Q   Did that terminate your boyfriend/girlfriend relationship with Ronney Stuckey?

A   Yes, sir.

Q   Well, did you continue to maintain a relationship with him after that?

A   No, sir.

Ex. E at 38-40.   The trial transcript reflects defense counsel challenged

M.J.'s testimony on cross-examination, specifically the year of this incident,

her memory, as well has her testimony that she did not have "any contact"

with Stuckey after he moved out of the home:

Q   Is it your testimony that prior to this alleged incident occurring in your house, that you had no suspicion whatsoever?

A   No, sir, I didn't.

Q   Okay.   And what was the date that occurred then?

A   I'm not sure of the date.   But, I know it was maybe 2000, 2001.

Q   2000?

A   2000, 2001.

Q   You're just not sure?

A   No.

Q   Okay.   And it's your testimony that you immediately asked Mr. Stuckey to leave the house?

A   Yes, sir.

. . . .

Q   Was there any other time before that date when you kicked him out that he had left your side to go live somewhere else?

A   Yes.

Q   When was that?

A   Probably – maybe in '99.

Q   Is it your testimony that either in 2000, 2001 when this alleged incident occurred and you kicked him out –

A   Uh-huh.

Q   -- that he never came back and lived with you?

A   No.

Q   When, around, did [J.M.J.] work for Mr. Stuckey in Thomasville, Georgia, at that Little Caesar's?

A   Well, she had to be around 14 maybe.

Q   Okay.   Before or after the alleged incident?

A   Before.

. . . .

A   . . . [J.M.J.] and my son shared a room.   And my [older] daughter . . .   had her own room.

Q   Where was your son when you walked in on Mr. Stuckey doing this thing?

A   I can't really remember.   I'm not sure if he was there. Sometimes he would stay with his daddy.   I'm not really sure.

Q   So you don't even know if he was there?

A   I can't remember.

Q   You had a fight with Mr. Stuckey?

A   Somewhat, yes, sir.

Q   But, you don't remember if your son was there?

A   I can't remember.

Q   You never reported that alleged incident to law enforcement, right?

A   No, sir.

Q   Why is that?

A   Because I didn't want her to know.

Q   You didn't want her to know that he was doing this above her?

A   I didn't want her to know that someone who was supposed to be her father, been there for eight years, would do something like that to her.   If she didn't know, I didn't want her to know.

Q   Why would you permit her then to go work with him at Professional Maintenance?

A   Because at that time she was an adult.   She was grown. And I feel like she could protect herself.

     And another thing, when I talked to Mr. Stuckey, I asked him if he had ever tried anything like that with her before.   He told me no.   He said that particular night, he had been smoking marijuana and drinking, he was out of his mind, he didn't know what he was doing.

Q   Okay.   So this person that is allegedly smoking marijuana and, for lack of a better word, masturbating over your daughter, when she turned 18, she was adult enough to go to work with him?

A   Yes.   A lot of people worked there.   She wasn't the only one.   As a matter of fact, I had three nephews that worked there, too.

. . . .

Q   Okay.   When did [J.M.J.] tell you about the alleged sexual conduct that he had been having with her?

A   That was in June.   I'm not sure of the date, but I think it was in June.

Q   You're not sure?

A   Of the date.

Q   Okay.   Is your testimony you never had any contact with Mr. Stuckey after he left living with you?

A   No, I haven't.

Q   You never did?

A   I picked my daughter up from work or whatever, but that was it.

Q   Did you ever call his residence?

A   He had a cell phone.   So a lot of times he would call me. Like if he had problems with my daughter at work, not doing what she was supposed to, a lot of times he would call me. Plus, we had land together, we had three cars together.   So we had to get all that stuff straightened out.

Q   So the answer is yes, you did have contact with him?

A   In that manner, yes.

Q   So you spoke to him on the phone?

A   Yes.

Q   And you had assets that needed to be divided?

A   Yes, straightened out or whatever.

Q   Took many years to do this?

A   Well, no, sir.

. . . .

Q   When did you kick him out?

A   2001.

Q   Okay.   How many times a week did you call him during 2001?

A   I mean, I don't remember.   I can't tell you that.   I don't remember.

Q   More than once?

A   Probably.

Q   Okay.   More than twice?

A   Like I said, I don't remember.   We had a lot of stuff to straighten out, so I don't remember.

Q   What about in 2002, how many times a week did you call Mr. Stuckey?   More than once?

A   Probably.

Q   What about in 2003, how many times did you call Mr. Stuckey each week?

A   I can't remember.

Q   More than once?

A   Probably.   I don't know.

Q   What about in 2004, how many times did you call him a week?

A   I can't tell you that either.

Q   More than once?

A   I can't tell you.   I can – I can't tell you that.   I don't know.

Ex. E at 46-53.

In addition, at the evidentiary hearing, Mr. Desmond testified that he

reviewed the trial transcript and his cross-examination of M.J.   Ex. O at

100-05.   He further testified:

> Q . . . Now, did the defendant ever speak to you or ever request that you get records from the property appraiser, from any insurance company regarding car purchases, or did he request you get bank records for him and Ms. [M.J.] in this case?
>
> A   Not that I have – and I've been through the file, which is pretty voluminous.   The focus was on trying to – let's just say that Mr. Stuckey maintained his innocence and maintained that this incident never occurred.   In other words, he said, I never – [M.J.] is completely lying about that.   And we looked at whether or not he could pin her down with something.
>
> The dates were kind of shaky in terms of what she was saying what had happened, and our reasoning was even if we were to convince someone or be able to pinpoint her down on something and prove that maybe it happened in 2002 or whenever, that the way she was answering questions throughout every phase, she likely would have just said, well, maybe it was 2003.   I don't have an exact estimate.
>
> So we didn't feel it was a very persuasive way to impeach her.   We thought the whole theory was she was not – this had never happened and we went with the argument that why if this had happened, why would the mother continue to let her child be near him when she was saying that I shut it down immediately.   So we thought, what can we do to try to find a way to demonstrate that they're still having communications. And we thought – and Mr. Stuckey came up with, well there's phone records.

*Id.* at 105-06.   Mr. Desmond testified regarding the trial strategy and that

they used the phone records in the case to show the number of calls made

between M.J. and Mr. Stuckey:

> Q   Now I would like to direct your attention, Mr. Desmond, to
> Page 45 of the trial transcript at Line 12.   Was one of the first
> questions you asked [M.J.] regarding her phone number?
>
> A   Yeah, it was actually the very first question.   I think I said
> good morning.   She said good morning.   And my very first
> question was, [M.J.], what's your phone number, your home
> phone number?   And she responded with [the phone number].
> And again, the whole idea there was I inquired to her during the
> cross at that point, but then the strategy was to come back later
> with the records, which we then put in and demonstrate – and I
> had the records custodian was able to testify there were 30
> some odd calls from that number to Mr. Stuckey's and that sort
> of thing, and also some other numbers, I think the victim as
> well, to demonstrate that there was still an ongoing relationship
> to impeach her credibility.
>
> Q   Okay.   So just let me make sure that I'm clear.   It was your
> trial strategy that you didn't want to pin her down on a time
> because your theory being that okay, she said it definitely
> happened on this date, you didn't really want to do that
> because your theory of the case was that she's lying about this
> anyway, because if this really happened she wouldn't have
> continued to have contact, and she did, in fact, continue to have
> contact; is that fair to say?
>
> A   Yeah, we looked at it like well, if we went and tried to
> pinpoint her down on a date for something that we knew didn't
> happen at all, that the best way to impeach her credibility was
> to show the jury that, in fact, she was continuing to have a
> relationship with him and we were using phone records to do it.
> Because the reality is, it's he said/she said.   I mean, she would
> say one thing, he would say the other.   And we said well, let's
> get the records, because they definitively demonstrate that at

least someone from her number was calling his number.   So
that way we could show hey, jury, she's definitely still engaging
in some communication with him.

Q   And why would a mother continue to engage in this type of
communication with a man that she caught doing this to her
child, unless it didn't happen; is that –

A   Well, that was the reasoning.   And the other point on that
was, if it's winding of business, that's one thing.   But the
frequency of the calls was the most compelling thing that I
thought I wanted to highlight to the jury.

Q   Okay.   And again, regarding the property appraiser's web
site, he never asked you to get records regarding that; correct?

A   Yeah.   I mean, we pretty much immediately figured out that
the way to go was to – that was not even relevant because it
never happened.   The way to demonstrate that she was not
telling the truth was to point out.   That so no, we never went
looking for any of those other things.

Q   Okay.   And let me ask you, in your opinion, sir, which better
would show the actual contact, the contact between the cell
phones or, you know, bank paperwork, or paperwork from the
property appraiser's office or insurance paperwork, I mean –

A   Yeah, I mean, the other thing on that, and I appreciate the
question, it's essentially – if the issue was whether or not he
had been kicked out of the house because he didn't want to
have contact, or she didn't want to have contact with him
because of this horrible thing that he had done, bank records
showing a continued financial relationship, insurance
documents, that really doesn't go to the issue of communication
the way demonstrating that someone from her number dialed
his number.   And it just, in my mind, it impeached her credibility
much more effectively than anything we could have done
otherwise.

*Id.* at 107-09.

Based on the foregoing, Stuckey has not shown the state court's rejection of this ground was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   *See* 28 U.S.C. § 2254(d)(1)-(2).   This ground should be denied.

### Ground 3: Trial Court Error and IAC – Prosecutor's Closing

In his third ground, Petitioner Stuckey asserts "[t]he prosecutor committed fundamental error during his closing argument (shifting the burden of proof by telling the jury that Petitioner Stuckey had to present a defense, telling the jury that their oaths required a guilty verdict, and telling the jury to return a verdict that 'speaks the truth[')]" and, further, that trial counsel "rendered ineffective assistance of counsel by failure to object to the improper comments."   ECF No. 6 at 16; *see id.* at 16-19.   In particular, Stuckey asserts the challenged comments (a) told the jury Stuckey had the burden to present a defense, (b) improperly referenced the jurors' oath, and (c) improperly directed the jury to "[c]ome back with a verdict that speaks the truth."   ECF No. 6 at 16-18.   Stuckey raised this claim, insofar as it

asserts trial court error, as the first point in his direct appeal.   Ex. I at ii, 13-
19.   To the extent this ground asserts IAC, Stuckey raised it as the fourth
ground in his Rule 3.850 motion.   Ex. O at 11-13.

### (a)  Burden to Present Defense

The trial transcript contains the following statements made by the
prosecutor during closing argument:

> Ronney Stuckey is guilty as charged.   Make no mistake
> about it.   And to believe otherwise defies common sense, it
> defies logic, and it defies the truth.

> Ronney Stuckey was in a position of trust.   Despite what
> he said in that stand, he was a father figure.

> This is before Ronney Stuckey.   This is after Ronney
> Stuckey.   Do you think it's a coincidence that [J.M.J.]'s life
> didn't turn out the way she wanted it to?

> He violated her in the worse possible way.   She lived
> with somebody that she trusted.   And he robbed her of her
> innocence, he destroyed her childhood, all for his own personal
> gratification.

> And how does he respond to that?   Well, no, this all
> happened after she was 18 when I gave her money to have sex
> with me.   That explains it.   That's his answer to this.

> . . . .

> And to believe that she engaged in a consensual sexual
> relationship when she turned 18, that's simply unbelievable.

> <u>There has to be a defense in this case for him</u>.   One of

the most important things the judge instructs you on is to use your common sense in assessing the evidence in this case. When confronted with the evidence before him, what kind of defense can I come up with?   He's got to come up with something.   That one defense, well, every time we talked about him having sex with me when I was a kid, and he was supposed to be my stepfather or act like my stepfather, the answer to that is, oh, no, I was talking about when she was 18. Or, I would say anything in the world to keep her calm and to keep her from going to talk to [M.J., her mother].

Does that make sense, to be accused of something as serious as what he was accused of, he would rather confess to that and not dispute a single thing than have [M.J.] maybe jump on him?   Does that make sense?   I submit to you it doesn't make sense at all.

. . . .

One of the things the judge also is going to tell you, and he already read it to you, is that it's not a defense that J.M.J. was willing to engage in acts which would constitute sexual battery or consent to engage in such acts.   Children don't consent.

And in order to find a way to try to answer what his responses were, he had to fashion – he had to fashion a defense to try in some way explain what he said on these tapes.   And, ladies and gentlemen, it's simply not believable. And the reason it's not believable is because he's guilty as charged.

It is what it is.   As much as no one wants to believe that things like that happen, he did it.   And when confronted with it, he never, ever disputed it.   So today he has got to come up with a way to dispute it.   And it's not credible.   It's simply not credible.

Ex. E at 215-22 (emphasis added).   During rebuttal, the prosecutor made

additional statements:

> You can't take the tape in a vacuum.   Again, what else could be said?   It is what it is.   There's no way to rationalize, talk around this.   And it's not taking things out of context.   You have heard everything.   And there is nothing that was said that can explain his responses.   Nothing.

> Nothing at all that makes any sense at all, that's truthful. And these are not out of context.   And, by all means, please, if you want to listen to the tape again, please do.

> This is the controlled call.   Excerpts of the controlled call. The only person I told you had sex with me was [K.J.] and we was young then.   Not little, as opposed to not fat.   We were still living on Georgetown Drive.   She's eight, nine, ten, living on Georgetown Drive.

> Don't even worry about it, girl, that ain't nothing.   As opposed to what in the world are you talking about?   The first opportunity to respond, where did that come from, don't even worry about that.   Huh?   That ain't nothing.   She's talking about that was bothering me a little bit.   Well, I think that's an understatement.

> Blows her off.   You hear that pause.   Anyway, whatever, if you can't make it in, just call me and let me know and we'll be fine.   Make it in to what?   She's working there.

> He comes on, doesn't have this separation letter.   She's testified she doesn't know she is being terminated.   That was supposed to be May 15.   She's working June 25.   Isn't it convenient that they would say the termination date was June 25?   The guy they brought in here, March?   He didn't even know.

*Id.* at 236-37 (emphasis added).   The prosecutor continued to discuss a

recorded phone conversation between Stuckey and the victim, and

Stuckey's responses to the victim's statements in the call:

> Remember I called you and I was telling you that I wanted to talk to you about when you used to have sex with me when I was little?   The defense translation:   when I wasn't fat.   What about it?   Not, what are you talking about?   The first opportunity:   What are you talking about?   No.   What about it?   What about it when I had sex with you when you were little?

> How young was I when you started doing this to me? Does that sound like a statement of somebody that was engaging in consensual sex after 18?   How young was I? Was I as young as seven, eight?   How young was I?

> [J.M.J.], what does this have to do with anything now? Like get over it.   What does this have to do with anything now?

> How does that somehow explain him saying this happened when she was 18?   Or I'm going to say anything to placate her, to mollify her, because I don't want to cause a scene.   Or, worse, I don't want mama to find out that I've been having an affair with you after you're of legal age. Unbelievable.   It's simply unbelievable.

> You did that shit to me at a young age.   Not 18.   And you ain't never said sorry to me or nothing.   I was nine years old.   And his response to that:   You never had a problem with it before or nothing like that.   Do you think a response like that is calming somebody down, placating somebody?   Do you think that response would do that?   Not in million years. Nothing but condescending. You never had a problem with it before or nothing like.

Of course, on the stand today, when he's testifying, somehow this nine years old, he was really referring to when she was 18.   Or, I'm just going to say anything.   Not say anything at all as opposed to you never had a problem with it before or nothing like that.   [J.M.J.], what is it you would like me to say to you, [J.M.J.]?   Condescending.   Listen to it.

At least say you're sorry for having sex with me.   At least that.   You never even said – I'm sorry, [J.M.J.], I never should have done it.   I apologize.   He says it just like that.

Then he decides, all right, we're going to go ahead and get away from this subject.   And now he's going to be a good father.   He's going to be a good father right now.   Life will be good for you.   [J.M.J.], all you need to do is just focus right now on what you want to do with yourself and your life.   That's his advice to her now.

Her response to that:   Well, that's probably why a lot of times I think I didn't finish school.   A lot of times why I ain't done a lot of shit I wanted to do because of you fucking with me when I was –

Didn't finish school.   How does that comport with him saying this was at 18 years of age?   This is all stuff that happened to her as a child.

And how does he respond?   I beg to differ.   Your problems in your life, I beg to differ, I really do.   I could be wrong, but I kind of tend to think that you're wrong, you know, because it wasn't something I just totally, 100 percent forced on you or anything like that.

If I appear to be a little incensed, I apologize for that. There's no excuse for that.   That's unbelievable.   I just totally forced on you or anything like that.   That is a child we're talking about.   Children don't consent.   Children shouldn't have to consent in that situation.

And then he says, you ain't got no tape on you or nothing, do you?   Hell, no.   Say, you ain't planning on getting a brother in trouble, is you?

And he goes back to being a good father, a good custodial – a person that she trusted when she was a very little girl.   When you find a job anywhere, or you apply for a job anywhere, just give them my number.   I will gladly give you a good recommendation.   But, just remember this if you do get a job somewhere else.   You need to work right.   I'll give you a very high recommendation.

This isn't out of context.   This isn't placating somebody. This isn't saying, you know what, I'll just say anything so [M.J.] doesn't jump on me.

You know, you never want to risk insulting anybody's intelligence by beating stuff and repeating it over and over again.   And I certainly wouldn't do that.   But, I can't emphasize enough that this isn't a Hitchcock turn-around, surprise twist ending.   This is exactly what it is.   <u>And he had to come up with a defense to somehow explain away all of these damaging comments</u>.   And he simply couldn't do it.   And he didn't do it. He's guilty as charged.

*Id*. at 238-41 (emphasis added).

In the initial brief on direct appeal, Stuckey's counsel asserted, in the

first point, that the prosecutor committed fundamental error during the

closing argument by making the statements emphasized in the quoted

portions set forth in the preceding paragraph.   Ex. I at 13-16.   Stuckey's

counsel argued these comments improperly shifted the State's burden of

proof.   *Id.*   The First DCA affirmed the case per curiam without a written

opinion.   The state court's ruling is entitled to deference and review is

limited to the record before the state court.   *See* 28 U.S.C. § 2254(d);

Cullen, 563 U.S. at 187-88; Richter, 562 U.S. at 99-03; Wright, 278 F.3d at

1255.   The challenged statements appear responsive to the statements

Stuckey made in the recorded phone conversation and his testimony at

trial, and not an impermissible shifting of the burden of proof.

To the extent this ground involves alleged IAC, the state post-

conviction trial court denied the claim after the evidentiary hearing and

made findings on the record:

> As to ground four, which we've referred to as the arguments made during closing, as evidenced by my question of Ms. Frusciante, I questioned and thought about it and went back and read all of the questions, because it is, as I eluded to it my questioning, is a difficult area.   There's no doubt that when – and I say just because somebody takes the stand doesn't mean you shift the burden, that's absolutely true and Ms. Frusciante said that.   I wasn't suggesting otherwise. What I was suggesting was that there are all kinds of statements that come into play, and more statements that are made when the defendant does take the stand, because suddenly his credibility is at issue.   Suddenly you can comment on whether or not his testimony makes sense and so forth. Statements that wouldn't be allowed to be made, obviously, if the defendant didn't take the stand.
>
> So we create sort of a – there's a different set of statements that are made when a defendant doesn't testify

versus when they do that can be construed as shifting the burden.   I do not find that – aside from the shifting the burden, I do not find the statements rose to a level which the different species or different claim of disparagement of the defense.   I don't think the prosecutor in this case said anything that could be constituted as disparagement, and you didn't argue that.   I was just recognizing that sometimes those two things can either be overlapped, be both, et cetera.

The only real[] way to disparage the defense or the – I don't think they disparage the defense or the defendant or defense counsel in the way it was done and placed in context. As I eluded in my questioning, and I find that the statements regarding he had to come up with a defense, so he had to say something, placed in context was responding to, you heard his explanations on the tape, they don't make any sense; or this is nonsense.   And I think that that, placed in context, was what was said.   And so it doesn't – it's not the mischief of shifting the burden.

The statement of they didn't back by the – did not bring a letter in, I think is objectionable and should have been objected to and should have been properly then been sustained, because it does elude to the fact, or suggest that he had some obligation to back up his statements with documents, which he does not, and was not a statement that should have been made.

That statement alone, I do not – while I think there should have been an objection, I do not think there was prejudice for a couple of reasons.   Number one, to the extent that the burden was shifting, the record before this Court was that these issues were raised on direct appeal.   I find that shifting the burden would be fundamental error.   It could have been raised, and in fact [was] raised by appellate counsel in this case, and the appellate court considered and rejected the claims.

Assuming arguendo, since we have a per curiam affirmed

and we don't know whether they addressed it on the merits, which I believe they could have, and for that reason I don't believe it would be prejudicial, but assuming they didn't, the question is, is would that statement, had it been objected to and there had been a curative instruction, or that statement stricken from the record and so forth, would that have reasonably altered the outcome of the trial?   I find that it would not have, and there's no prejudice on the secondary basis.

Not only was it raised and could have been raised as fundamental error.   Alternatively, even if it couldn't have been raised as fundamental error, it wouldn't have altered the outcome of the trial in this case, whether there had been a curative instruction or not.   Moreover, it's a reasonable tactical decision not to object to things in closing argument, which you think either (a) will ultimately come in overruled, or (b) not wanting to call attention to it by asking for a curative instruction and putting an exclamation point on it.

Regardless, I find the statement standing alone would not constitute prejudice for the two reasons I stated, both again, that it was raised as fundamental error.   And even if it couldn't have been, standing alone, it would not have been.

Ex. O at 236-39.

The record supports the state post-conviction court's finding that, even assuming the prosecutor's comments were improper, given the evidence against Stuckey, including the recorded phone conversation between Stuckey and the victim and the victim's testimony at trial, there is no reasonable probability that a successful objection would have made a difference in the jury's verdict.   *See* Ex. E at 57-75 (victim's trial

testimony), 105-08 (publication of recorded phone call during trial).

Moreover, in federal habeas, "[t]he relevant question is whether the

prosecutor's comments 'so infected the trial with unfairness as to make the

resulting conviction a denial of due process.'" Darden v. Wainwright, 477

U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637

(1974)).   The comments must have been improper and have rendered the

trial fundamentally unfair.   United States v. Eyster, 948 F.2d 1196, 1206

(11th Cir. 1991).   This Court's review of the record does not indicate the

prosecutor's comments, even if questionable, rose to such a level as to

result in an unfair trial or deprivation of due process.   *See* Darden, 477

U.S. at 181; Eyster, 948 F.2d at 1206; *see also* Tucker v. Kemp, 802 F.2d

1293, 1296 (11th Cir. 1986) ("If a reviewing court is confident that, absent

the improper remarks, the jury's decision would have been no different, the

proceeding cannot be said to have been fundamentally unfair.").

### (b)  Reference to Jurors' Oath

During the initial closing argument, the prosecutor concluded with

these statements:

> Come back with the only verdict that comports with your
> oaths as jurors, the only verdict that doesn't defy logic, common
> sense, and the truth.   Come back with a verdict that speaks the
> truth.   And that's a verdict of guilty as charged.

Ex. E at 222.   On direct appeal, Stuckey's counsel asserted, in the first

point, that the prosecutor committed fundamental error during the closing

argument by making the emphasized statements because the prosecutor

improperly referenced the jurors' oath, invaded the province of the jury, and

directed the jurors as to how they should decide the case.   Ex. I at 16-17.

The First DCA affirmed the case per curiam without a written opinion.   The

state court's ruling is entitled to deference and review is limited to the

record before the state court.   *See* 28 U.S.C. § 2254(d); Cullen, 563 U.S.

at 187-88; Richter, 562 U.S. at 99-03; Wright, 278 F.3d at 1255.

The prosecutor's unobjected-to comments do not appear improper as

they ask the jury to evaluate the evidence presented and determine, as the

finder of fact, what happened in this case.   *See, e.g.*, Waters v. Thomas,

46 F.3d 1506, 1523 (11th Cir. 1995) (rejecting claim under Caldwell v.

Mississippi, 472 U.S. 320 (1985), that prosecutor's comments were

improper and explaining:   "Instead of undermining the jury's sense of

responsibility for its sentence verdict, the prosecutor's argument, as a

whole, stressed the importance of the jury's verdict and urged the jurors to

follow their oath and 'return a verdict that speaks the truth under the

evidence that you heard and under the law of this case.'").   *See also, e.g.*,

Griffin v. State, 866 So. 2d 1, 16 (Fla. 2003) (explaining that, in closing

argument, prosecutor may "review the evidence and . . . explicate those

inferences which may reasonably be drawn from the evidence"); Steurer v.

Crews, No. 4:10cv383-RH/EMT, 2013 WL 4096120 at *21-22 (N.D. Fla.

Aug. 11, 2013) (order adopting report and recommendation which, among

other grounds, addressed claim asserting IAC for failing to object to

prosecutor's allegedly improper closing argument that asked jury "to render

a verdict that finds him guilty as charged . . . . Render a verdict that speaks

the truth," and explained counsel was not deficient for failing to object

because the comments were not improper:   "[T]he prosecutor's comments

in the instant case properly commented on the jury's obligation to

determine the credibility of the witnesses' testimony and did not suggest

any improper basis for reaching a verdict.   There was no suggestion that

the jurors' determination of who was telling the truth should be the sole

basis for the jury's verdict; instead the prosecutor asked the jury to find

Petitioner guilty 'because the evidence and the law and your common

sense require it.'").   Moreover, to the extent this claim alleges ineffective

assistance of counsel for not objecting to the comment, such claim should

fail because the comment was not improper.

### (c)  Verdict that Speaks the Truth

As quoted in part (b), *supra*, the prosecutor concluded the initial

closing by stating to the jury, "Come back with a verdict that speaks the

truth."   Ex. E at 222.   On direct appeal, Stuckey's counsel asserted, in the

first point, that the prosecutor committed fundamental error by making this

statement, relying on <u>Northard v. State</u>, 675 So. 2d 652 (Fla. 4th DCA

1996).   Ex. I at 17-18.   The First DCA affirmed the case per curiam

without a written opinion.   The state court's ruling is entitled to deference

and review is limited to the record before the state court.   *See* 28 U.S.C.

§ 2254(d); <u>Cullen</u>, 563 U.S. at 187-88; <u>Richter</u>, 562 U.S. at 99-03; <u>Wright</u>,

278 F.3d at 1255.

As with the analysis in part (b), *supra*, the prosecutor's unobjected-to

comment does not appear improper as it did not suggest any inappropriate

basis for reaching a verdict.   The trial judge instructed the jury regarding

the State's burden of proof and that the defendant is not required to prove

anything:

> The defendant has entered a plea of not guilty.   This
> means you must presume or believe the defendant is innocent.
> The presumption of innocence stays with the defendant as to
> each material allegation in the information through each stage
> of the trial unless it has been overcome by the evidence to the
> exclusion of and beyond a reasonable doubt.

To overcome the defendant's presumption of innocence, the State has the burden of proving the crime with which the defendant is charged was committed and the defendant is the person who committed the crime.

The defendant is not required to present evidence or prove anything.

Ex. E at 209.   The judge instructed the jury on reasonable doubt, weighing the evidence, and evaluating the testimony of witnesses, including the defendant.   *Id.* at 209-11.   The judge further instructed the jury:

Rule for deliberations.   There are some general rules that apply to your discussions.   You must follow these rules in order to return a lawful verdict.

One, you must follow the law as it is set out in these instructions.   If you fail to follow the law, your verdict will be a miscarriage of justice.   There is no reason for failing to follow the law in this case.   All of us are depending upon you to make a wise and legal decision in this matter.

Two, this case must be decided only upon the evidence that you have heard from the testimony of the witnesses and have seen in the form of the exhibits in evidence and these instructions.

Three, this case must not be decided for or against anyone because you feel sorry for anyone or are angry at anyone.

Four, remember, the lawyers are not on trial.   Your feelings about them should not influence your decision in this case.

> Five, your duty is to determine if the defendant has been proven guilty or not in accord with the law.   It is the judge's job to determine a proper sentence if the defendant is found guilty.

> Six, whatever verdict you render must be unanimous. That is, each juror must agree to the same verdict.

> . . . .

> Deciding a verdict is exclusively your job.

*Id.* at 211-13.   Finally, the judge instructed the jury that "what the attorneys say is not evidence."   *Id.* at 215.   *See, e.g.*, <u>Dunlap v. State</u>, 21 So. 3d 873, 877 (Fla. 4th DCA 2009) (holding trial court did not abuse discretion in denying motion for mistrial where prosecutor asked the jury to "make a collective decision on what the truth is" and explaining, "It was not improper to utter the word 'truth' in the context of the jury's role as factfinder, particularly where, as here, the comment was immediately followed by a clear explanation of the State's burden of proof in the defense opening statement, and the jury was properly instructed on the State's burden of proof by the judge at the conclusion of the case."). *Cf.* <u>Northard</u>, 675 So. 2d at 653 (reversing and remanding for new trial where prosecutor's objected-to comments in opening statement and closing argument that jury "deliberate and come back with a verdict, a verdict that simply reflects the truth; that the defendant in this case was caught red-handed" and "[i]f you

believe the defendant's events the police cannot possibly be telling you the

truth . . . in order to find him not guilty you're going to have to believe that

the defendant was telling the truth and the officer was lying" were

"impermissible because [they] improperly asked the jury to determine who

was lying as the test for deciding if appellant was not guilty" and invited "the

jury 'to convict the defendant for a reason other than his guilt of the crimes

charged'" (quoting <u>Bass v. State</u>, 547 So. 2d 680, 682 (Fla. 1st DCA

1989))).   Moreover, as with part (b), to the extent this claim alleges

ineffective assistance of counsel for not objecting to the comment, such

claim should fail because the comment was not improper.

Based on the foregoing, Stuckey has not shown the state court's

rejection of the claims in this ground was either (1) contrary to, or involved

an unreasonable application of, clearly established U.S. Supreme Court

precedent, or (2) based on an unreasonable determination of the facts in

light of the evidence presented in the state court proceeding.   *See* 28

U.S.C. § 2254(d)(1)-(2).   This ground should be denied.

### <u>Ground 4</u>:   IAC – Jury Instruction

In his fourth ground, Petitioner Stuckey alleges trial counsel provided

ineffective assistance by not objecting to the jury instruction "in that the act

[as charged in the information] was penetration by his penis and his fingers,

and the jury instruction stated penetration occurred by the penis and/or

fingers thus allowing a non-unanimous verdict."   ECF No. 6 at 19.

Stuckey raised this ground as the sixth claim in his Rule 3.850 motion.   Ex.

O at 16-17.   After the evidentiary hearing, the state post-conviction trial

court denied the claim, making the following findings on the record:

> As to the instructions regarding penetration written in the and/or, the First DCA case, Ms. Frusciante was absolutely correct that – and we referred to this when we last met on June 1st , and I apologize – well, there were a number of cases. Give me one moment, please.   Let me grab my notes. . . . I think Perry v. State, 10 So3d 695, Florida First DCA, 2009, does give us some guidance.
>
> Regardless, I find that – and that's at – it doesn't require a factual finding.   The question is whether the information, the way it was charged in the jury instruction as given, was error; is that correct?
>
> MS. FRUSCIANTE:   Yes.
>
> THE COURT:   All right.   And based on Perry v. State – and again, recognizing it's not dispositive, I find that there was no error in giving the instruction as written.   Having said that, based on the testimony and so forth, occasionally such an objection to instruction would require a factual finding.   But in this case, in light of the testimony here, I don't think it requires any separate factual finding, correct?
>
> MS. FRUSCIANTE:   Correct.
>
> THE COURT:   All right.   When I say separate factual

finding, sometimes obviously you can have evidence of union
versus penetration, and so you have to make findings of fact
related to the record as to alternate theories and so forth.
Here I do need to make a factual finding that because I think it
was legally appropriate, the instruction, I don't find there was
any deficient performance in failing to object to the instruction.
Moreover, I find that there's no prejudice because I find that it
was an appropriate instruction to be given.

Ex. O at 239-41.   The First DCA affirmed the ruling on appeal.   The state

court's ruling is entitled to deference and review is limited to the record

before the state court.   *See* <u>Cullen</u>, 131 S.Ct. at 1388.

The record supports the state court's ruling.   In particular, the trial

transcript reflects that the trial judge instructed the jury in pertinent part:

Ronney Stuckey, the defendant in this case, has been
accused of the crimes of sexual battery on a child under twelve
years of age and sexual battery by a familial or custodial
authority.

To prove the crime of sexual battery upon a person less
than twelve years of age, the State must prove . . . the following
three elements beyond a reasonable doubt:   One, J.M.J. was
less than 12 years of age; two, Ronney Stuckey committed an
act upon J.M.J. in which the penis and/or fingers of Ronney
Stuckey penetrated the vagina of J.M.J.; three, Ronney Stuckey
was 19 years of age or old lesser.

. . . .

Count II, sexual battery upon a child twelve years of age
or older, but under 18 years of age by person in familial or
custodial authority.   To prove the crime of sexual battery upon
a child by a person in familial or custodial authority, the State

must prove the following three elements beyond a reasonable
doubt:   One, J.M.J. was twelve years of age or older, but less
than 18 years of age; two, Ronney Stuckey stood in a position
of familial or custodial authority with regard to J.M.J.; three,
Ronney Stuckey committed an act upon J.M.J. in which the
vagina of J.M.J. was penetrated by the fingers and/or penis of
Ronney Stuckey.

Ex. E at 207-08.   As the state post-conviction court found, the First DCA's

decision in Perry v. State, 10 So. 3d 695 (Fla. 1st DCA 2009), is instructive

regarding Stuckey's argument that defense counsel should have objected

to the jury instruction given in his case because the difference between the

information and the instructions "makes the verdict ambiguous as to exactly

what act(s) the jurors relied upon in making their determination of guilt," Ex.

O at 17.   In Perry, the First DCA rejected the defendant's argument that

the trial court erred in denying his request for a special verdict form

containing choices for the jury regarding which method of sexual battery he

committed, and the court explained:

        In Florida, the prosecution for sexual battery upon a child
is treated differently than other crimes in terms of charging
documents, multiple dates and acts, and statutory definitions.
Whittingham v. State, 974 So. 2d 616, 618 (Fla. 4th DCA 2008).
The statutory definition of sexual battery includes several
alternatives, all of which constitute sexual battery.
§ 794.011(1)(h), Fla. Stat. (2006). . . . The definitions contained
in section 794.011, Florida Statutes, contemplate proof of
sexual battery by alternative methods.   Because the legislature
has the primary authority for defining crimes, charging

documents which track the statutory language are presumably sufficient to notify the accused of the misconduct or offense with which he or she is charged.

. . . .

Here, appellant argues that the lack of detail contained in the jury verdict form rendered the verdict non-unanimous. Appellant refers to no case precedent, statute, or rule of procedure – and this court has located no such authority – requiring a special verdict form which adds specificity to the statutory definition of sexual battery in order for a jury to find a defendant guilty of committing sexual battery. . . . For jury instructions, it is well settled that special jury instructions must not be misleading or confusing. Stephens v. State, 787 So. 2d 747 (Fla.), *cert. denied*, 534 U.S. 1025 . . . (2001). It follows that a confusing or misleading jury verdict form would also be improper. It is also well settled that for murder convictions, no special jury instruction requiring unanimity on the type of murder, whether felony murder or pre-meditated murder, is required. Parker v. State, 641 So. 2d 369, 375 (Fla. 1994) ("special verdicts identifying the type of murder are not required"). Applying the rule in Parker to this case, the trial court's denial of defendant's requested special jury verdict form indicating unanimity on the particular method of sexual battery on a child did not preclude unanimity of the verdict and did not constitute error.

10 So. 3d at 697-98. Because the jury instruction, as given in this case, was not improper, defense counsel cannot be ineffective for failing to object to the instruction.

Based on the foregoing, Petitioner Stuckey has not shown that the state court's adjudication of this ground involved an unreasonable

application of clearly established federal law or that it based on an unreasonable determination of the facts.   *See* 28 U.S.C. § 2254(d)(1)-(2). This ground should be denied.

### <u>Ground 5</u>:   Trial Court Error – Upward Departure Sentence

In his fifth ground, Petitioner Stuckey asserts the trial court erred by relying on his conviction for a capital felony as a basis for an upward departure sentence.   ECF No. 6 at 21-24.   Stuckey raised this claim, through counsel, in a motion to correct sentencing error filed in the state trial court pursuant to Florida Rule of Criminal Procedure 3.800(b)(2).   Ex. O at 411-15.   The state court partially granted the motion, denying it as to the sentence imposed but including a written statement of the basis for the departure sentence.   Ex. at 420-21.   In particular, as to the imposition of the departure sentence, the court explained:

> The motion to correct sentencing error is essentially a motion for rehearing of the prior resentencing.   Both parties make the same arguments now as when Mr. Stuckey was resentenced in March, 2008.   The state continues to rely on the principles stated in <u>Bunney v. State</u>, 603 So. 2d 1270 (Fla. 1992) as a legal basis for the court to depart above the guidelines maximum.   Mr. Stuckey relies upon <u>Knarich v. State</u>, 932 So. 2d 257, 261 (Fla. 2d DCA 2005) for the proposition that the departure rule codified a limited basis for a departure for "other noncapital felonies that arose out of the same criminal episode or transaction."

> The essential facts proved at trial were that Mr. Stuckey
> sexually battered a child victim repeatedly starting about the
> age of 9 years and continuing throughout the victim's childhood.
> The state proved and the jury necessarily found sexual
> batteries before and after the child victim's 12th birthday thus
> supporting the scoreable sexual battery and the nonscoreable
> capital sexual battery.
>
> The court again concludes that the jury's convictions provide a
> sufficient basis to depart from the guidelines sentence and to
> impose the statutory maximum for count 2 because the jury
> convicted Mr. Stuckey of the unscored capital sexual battery in
> count 1.   See Thomas v. State, 875 So.2d 804 (Fla. 1st DCA
> 2004); Ashe v. State, 819 So.2d 195 (Fla. 4th DCA 2002);
> Bunney v. State, 603 So.2d 1270 (Fla. 1992) and Smith v.
> State, 515 So.2d 182 (Fla. 1987).   Additionally, the utter
> devastation Mr. Stuckey's conduct caused this defenseless
> child victim persuades the court to exercise the discretion
> afforded by the valid departure basis by imposing the maximum
> lawful sentence.

*Id.*  Stuckey challenged this ruling as the second point in his direct appeal

to the First DCA, *see* Ex. I at 20-26, and that court affirmed the case per

curiam without a written opinion, Ex. L.

As Respondent indicates, this ground does not present a federal

claim.   *See* ECF No. 18 at 27-28.   This is a state law claim and this Court

must defer to the state court's determinations of state law issues.   *See,*

*e.g.*, Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly

held that a state court's interpretation of state law, including once

announced on direct appeal of the challenged conviction, binds a federal

court sitting in habeas corpus."); <u>Mullaney v. Wilbur</u>, 421 U.S. 684, 691

(1975) ("This Court . . . repeatedly has held that state courts are the

ultimate expositors of state law . . . ."). Federal habeas relief is available

to correct only constitutional injury. 28 U.S.C. § 2254(a); <u>Estelle v.

McGuire</u>, 502 U.S. 62, 67-68 (1991). Questions of state law and

procedure "rarely raise issues of federal constitutional significance,

because '[a] state's interpretation of its own laws provides no basis for

federal habeas corpus relief, since no question of a constitutional nature is

involved.'" <u>Tejada v. Dugger</u>, 941 F.2d 1551, 1559 (11th Cir. 1992)

(quoting <u>Carrizales v. Wainwright</u>, 699 F.2d 1053, 1053-54 (11th Cir.

1983)). Indeed, in a similar case, the Eleventh Circuit affirmed a district

court's dismissal of a § 2254 petition alleging the denial of due process and

equal protection where the state trial judge "relied on invalid reasons in

departing from the Florida sentencing guidelines (Fla. R. Crim. P. 3.701)

and increasing [petitioner's] sentence from the recommended 12-30

months to 15 years," relying on 28 U.S.C. § 2254(a) and explaining:

> [A] habeas petition grounded on issues of state law provides no
> basis for habeas relief. In the area of state sentencing
> guidelines in particular, we consistently have held that federal
> courts can not review a state's alleged failure to adhere to its
> own sentencing procedures. This limitation on federal habeas
> review is of equal force when a petition, which actually involves

state law issues, is "couched in terms of equal protection and due process."

In the instant case, petitioner argues that the trial judge misinterpreted Florida law regarding departure from recommended guidelines for sentencing.   He cites numerous Florida cases and argues that, if the trial judge had correctly interpreted Florida case law and the Florida Rules of Criminal Procedure, petitioner would have been given a shorter sentence.   As a result of these alleged violations of state law, petitioner argues, he is being denied due process and equal protection as guaranteed by the Constitution of the United States.

It is our opinion that the petition raises issues of state law only and, thus, must be dismissed.   Although petitioner alleges violations of federal law, it is clear that this petition is based exclusively on state law issues which are merely "couched in terms of equal protection and due process."   Were this Court to undertake a review of the instant petition, we would have to conduct an examination of Florida case law and of the Florida Rules of Criminal Procedure.   This we will not and can not do.

Branan v. Booth, 861 F.2d 1507, 1508 (11th Cir. 1988) (citations omitted).

Here, Petitioner's ground focuses on state case law and procedural rules.   ECF No. 6 at 21-23.   Petitioner does not appear to even attempt to assert a federal claim, arguing only summarily that "[t]he state court's ruling was contrary to and an unreasonable application of Petitioner Stuckey's constitutional rights."   Id. at 23.   Federal habeas relief is not available.

## Conclusion

Based on the foregoing, Petitioner Ronney Stuckey is not entitled to federal habeas relief.   The amended § 2254 petition (ECF No. 6) should be denied.

## Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."   Rule 11(b) provides that a timely notice of appeal must still be filed, even if the court issues a certificate of appealability.

Petitioner fails to make a substantial showing of the denial of a constitutional right.   28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84 (2000) (explaining substantial showing) (citation omitted). Therefore, the Court should deny a certificate of appealability.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."   The parties shall make any argument as to whether a certificate should issue by objections to this Report and

Recommendation.

Leave to appeal in forma pauperis should also be denied.   *See* Fed.

R. App. P. 24(a)(3)(A) (providing that before or after notice of appeal is

filed, the court may certify appeal is not in good faith or party is not

otherwise entitled to appeal in forma pauperis).

### Recommendation

It is therefore respectfully **RECOMMENDED** that the Court **DENY** the

amended § 2254 petition (ECF No. 6).   It is further **RECOMMENDED** that

a certificate of appealability be **DENIED** and that leave to appeal in forma

pauperis be **DENIED**.   The Clerk shall substitute Julie L. Jones for Michael

D. Crews as Respondent.

**IN CHAMBERS** at Tallahassee, Florida, on October 11, 2016.

**S/ Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this**
**Report and Recommendation, a party may serve and file specific**
**written objections to these proposed findings and recommendations.**
**Fed. R. Civ. P. 72(b)(2).   A copy of the objections shall be served**
**upon all other parties.   A party may respond to another party's**
**objections within fourteen (14) days after being served with a copy**
**thereof.   Fed. R. Civ. P. 72(b)(2).   Any different deadline that may**

**appear on the electronic docket is for the Court's internal use only and does not control**.   If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.   *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.